**UNITED STATES of America ex rel.
Norman Benjamin PARSON,
Petitioner,**

v.

**Raymond W. ANDERSON, Respondent.**

**No. 152.**

United States District Court,
D. Delaware.

Nov. 28, 1972.

Carl Schnee, of Tybout, Redfearn & Schnee, Wilmington, Del., Richard E. Poole, of Potter, Anderson & Corroon, Wilmington, Del., for petitioner.

Jerome O. Herlihy, Chief Deputy Atty. Gen., Peter W. Green, Wilmington, Del., for respondent.

## OPINION

STAPLETON, District Judge.

This habeas corpus proceeding requires this Court to answer, among others, the question whether, under all the circumstances of this case, petitioner was denied due process of law by being subjected to trial at a time when psychogenic amnesia had deprived him of any substantial, independent recollection of events occurring on the evening of the crime.

Kathleen Rae Maull, a fifteen year old babysitter, was killed during the evening of January 31, 1964. Petitioner, Norman Benjamin Parson, was arrested at approximately 11:40 P.M. that evening. He was subsequently indicted for "murder in the first degree in that he caused the death of Kathleen Rae Maull while attempting to perpetrate a rape upon her." The ensuing legal proceedings have now consumed nine years.

The evidence against the petitioner has been catalogued by the Supreme Court of Delaware and will not be repeated in its entirety here. See Parson v. State, 222 A.2d 326 (Sup.Ct.1966). A summary history of the case is a necessary predicate, however, to an understanding of the arguments which petitioner now presses.

At the time of his arrest, Parson made two unsolicited incriminating comments. Thereafter, in the early morning of February 1, 1964, he gave a five page written statement to the police. His recollection of the events of the preceding evening was intact at that time.

Counsel was appointed to represent petitioner on February 1, 1964. They conferred at sometime during that day.[1] Petitioner was indicted on March 2, 1964. On March 13, 1964, the state moved in the Superior Court of the State of Delaware for a mental examination of the defendant by a state psychiatrist. On the same day the defense moved for funds to employ a defense psychiatrist. The court authorized the defendant to employ a psychiatrist, Dr. William Byrne, and a psychologist, Dr. Irvin Weintraub, to examine the defendant. The court also authorized examination by a psychologist, Sheldon W. Welsy and a psychiatrist, Harry S. Howard, both of whom were in the employ of the State Mental Hygiene Clinic.

Dr. Weintraub administered a series of psychological tests on June 13, 1964 at Dr. Byrne's request. His report concluded in part as follows:

"Frustration tolerance and self-control are variable. External/or internal duress can arouse considerable anxiety and prove highly weakening to ego controls. During these moments there would be evidence of associational blocking, ineffective reasoning

---

1. From February 4, 1964 petitioner was represented by two appointed counsel, in accordance with the then existing Delaware practice in capital cases.

and a tendency towards compulsive acting out:

\* \* \* \* \* \*

The reality and emotional weaknesses are such as to suggest a paranoid process."

Dr. Byrne, after his examination of Parson and review of Dr. Weintraub's report, concluded as follows:

"It is my feeling that Mr. Parson at this time is non-psychotic. His history, reactions in interviews and psychological profiles point to a very passive individual who found it necessary to suppress all hostile -impulses. Apparently these impulses could no longer be contained and with the use of alcohol, his self-control slipped and the crime took place. I feel his amnesia is partial, genuine and when he says it could not happen, he is being truthful. He is incapable of understanding that anyone could have such impulses. It is my opinion that if the Court sets him free, he should be hospitalized in a mental hospital until such time as the medical staff feels he could handle such impulses."

While Dr. Byrne's report notes "partial, genuine amnesia," neither the psychologist nor the psychiatrist for the defense considered this condition as it existed at that time as preventing the formulation of a conclusion as to Mr. Parson's condition.

The state psychologist who examined Parson on June 1, 1964 reported that "because of poor cooperation, extremely meager productivity and general evasiveness, little can be said concerning the pychodynamics of his personalty." The state psychiatrist reported his conclusion to the court as follows:

"The evaluation of the entire situation suggests that he was not psychotic at the time of the alleged crime (as manifested by his detailed statement to the police) and that he was not psychotic at the time of the examination. In this respect, then, one may assume that he knows right from wrong and, knowing right from wrong could have been expected to adhere to the right. With this in mind then, he could be held responsible for his behavior. However, this patient is probably fabricating (our psychologist suspected). If, as the writer believes, the defendant has actually repressed all of this material, then it would be most difficult for him to assist his attorney in the preparation and presentation of his defense. With this in mind, it is our opinion that he should be transferred to the Delaware State Hospital for further observation and that no limitation should be placed on the means and methods of the examination at the State Hospital. It seems quite likely that we could get a much clearer picture of the situation if we are at liberty to use Sodium Amytal or hypnotic studies on him."

Parson was tried in January of 1965. No defense of insanity at the time of the crime was asserted and no hearing on competency to stand trial was requested or held. The jury returned a verdict of guilty of murder in the first degree without a recommendation of mercy. Parson was sentenced to hang. The Supreme Court of Delaware affirmed this conviction, Parson v. State, 222 A.2d 326 (Sup.Ct.1966),[2] and the Supreme Court of the United States denied certiorari, 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807 (1966).

Parson then filed a petition for a writ of habeas corpus in this Court. This Court found that the reports of the doctors "were sufficiently clear to raise a

---

2. The Supreme Court reversed the conviction on counts II and III charging Parson with having killed Kathleen Rae Maull "with express malice aforethought by either stabbing or by beating her" on the grounds that there was "no specific proof whatsoever of actions by Parson in the nature of premeditation, planning, de-

liberation, selection and use of a deadly weapon, or anything of that nature." It affirmed the verdict of guilty of first degree murder as to count I, however, on the ground that the evidence supported the charge that Parson killed the victim while attempting to rape her.

doubt in a reasonable mind" as to defendant's competence to stand trial. United States ex rel. Parson v. Anderson, 280 F.Supp. 565, 569 (D.Del.1967). It, therefore, concluded "the need for a preliminary hearing as to defendant's mental state was . . . plainly apparent." [3]

Thereafter, this Court held an evidentiary hearing directed to the question of whether it was then possible for a qualified psychiatrist to determine Parson's mental condition as of the time of the first trial three years before. Both psychiatrists, Drs. Howard and Byrne, and the state's original psychologist had died in the interim. Dr. Anstreicher testified for the state and Dr. Flaherty, a court appointed psychiatrist, testified for the defense. The Court concluded that it was doubtful whether psychiatric evaluation at that time could provide a basis for a definite conclusion regarding Parson's mental condition at the time of his trial. Under Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) the court accordingly felt compelled to grant the relief requested in the petition for the writ of habeas corpus unless the state decided to retry the petitioner within a reasonable period of time. The state elected to retry petitioner.

During the period from the return of the case to the state courts in January of 1968 to June of 1969, the defendant was again studied for the purpose of determining his competency to stand trial. Dr. Anstreicher directed the examination for the state. Two psychiatrists, Dr. Rappaport[4] and Dr. Voegele, were appointed by the court to act as defense psychiatrists. As a result of defense concern about possible violations of Parson's constitutional rights, the orders authorizing these examinations restricted the amount of information available to the doctors, provided that no drugs or shock treatment would be used and required that Dr. Anstreicher's report would be made solely to the court. The defense doctors were allowed to report to the defense attorneys.

A competency hearing was held on June 2nd and 3rd of 1969. Drs. Weintraub and Voegele testified for the defense; Dr. Anstreicher for the state. Dr. Weintraub indicated that Parson's condition had not substantially changed since the time of his investigation in 1964. His diagnosis was:

> "On the basis of the psychological testing, the pattern would fit a schizophrenic reaction, paranoid type."

He further expressed the view that Parson would be able to understand the nature of the trial but that his ability to aid counsel in cross-examination of witnesses was "open to doubt."

Dr. Voegele testified that he would need further tests and further information in order to reach a definite conclusion on Parson's present mental state. In order to determine whether defendant's current amnesia was feigned or genuine, Dr. Voegele recommended testing under hypnosis and under the influence of sodium amytal. He further suggested that it would be necessary to observe Parson in a hospital setting.

Dr. Anstreicher testified (1) that he was not then psychotic, (2) that the symptoms mentioned by Dr. Weintraub, i. e. hostile feelings and psychosexual aberrations, were not in this context symptoms of schizophrenia, (3) that he was currently capable of understanding the nature of the charge and of the legal proceedings and (4) that he would be

---

3. The Court's decision rested solely upon the issue of competency to stand trial. It differentiated this issue from the issue of insanity at the time of the crime. Thus, the court observed, "the reports of the psychologists and psychiatrists made before trial pursuant to examination ordered by the trial court, clearly indicated that, while defendant knew the difference

between right and wrong at the time of the offense charged, nevertheless, at the time of the trial he was mentally ill to some degree."

4. Dr. Rappaport's findings were not tendered by the defense in the subsequent proceedings.

able to assist his counsel except to the extent that his amnesia, if genuine, would preclude Parson from supplying his counsel with facts concerning the events at the time of the crime. Dr. Anstreicher did emphasize, however, that the information available to him had been limited. While he felt his investigation had been thorough enough so that further testing and hospitalization would not change his conclusion, Dr. Anstreicher agreed that all avenues available to psychiatrists and psychologists in arriving at a proper evaluation had not been exhausted.

Based on this testimony, the court continued the hearing, indicating that it wanted each of the three doctors to be given the opportunity to examine Parson again and explore any avenues that they might see fit to explore without qualification. Further testing ensued, including interviews of Parson under hypnosis and after the administration of sodium amytal. Dr. Martin Orne was engaged by the defense to conduct the examinations under hypnosis.

Prior to Parson's second trial, a hearing was held out of the presence of the jury. The reports of Dr. Anstreicher and Dr. Orne as well as the backup data for their reports were placed into evidence and sealed. Drs. Anstreicher, Voegele and Orne then gave oral testimony. All agreed (1) that while Parson suffered from "personality disorders", he was not then suffering from schizophrenia or any other psychosis, (2) that his amnesia was probably genuine and would persist at least as long as it remained in Parson's self-interest not to retrieve the lost facts from his subconscious, (3) that he was presently competent to stand trial unless his amnesia were held to render him incompetent,

and (4) it was not then possible to ascertain with certainty the state of Parson's mind on the night of the alleged crime.[5]

The court then heard the arguments of counsel. The defense's primary argument was that it had demonstrated "a substantial possibility that the defense of mental illness [at the time of the commission of the crime] could be raised" but for the amnesia, and that the defendant's inability to assist his counsel with respect to this defense rendered him incompetent to stand trial.

The next morning the court made the following findings of fact and conclusions of law at a pre-trial ruling on the issue of competency to stand trial:

1. Parson was not then psychotic and had a full understanding and rational awareness of the proceedings against him.

2. Parson was suffering from personality problems and conditions of many years duration, none of which rose "to the level of being considered mental illness."

3. The most "reasonable assumption" was that Parson's amnesia was genuine.

4. The test of competency to stand trial is whether the defendant has the ability to understand the proceedings against him and to properly assist in his own defense.[6]

5. Amnesia per se should not automatically preclude trial under this test. "Amnesia should bar prosecution only when its presence would in fact be crucial to the construction and presentation of the defense."[7]

6. If there were a defense, it could be constructed from sources extrinsic to the defendant.[8]

---

5. Drs. Voegele and Orne testified that it *might* be possible to formulate an opinion if Parson were able to tell them what happened that night but this would depend on what he would be able to tell them.

6. The court cited Mills v. State, 256 A.2d 752 (Del.1969).

7. The court relied upon Wilson v. United States, 129 U.S.App.D.C. 107, 391 F.2d 460 (1968); Commonwealth v. Price, 421 Pa. 396, 218 A.2d 758 (1966) and 71 Yale L.J. 109 (1961).

8. After noting that "substantially the same information" was available to the defendant that "his present independent recollec-

For these reasons defendant, following the preliminary hearing on competency, was found competent to stand trial. The court then indicated that, in accordance with Wilson v. United States, 129 U.S.App.D.C. 107, 391 F.2d 460 (1968), it would make final findings and conclusions with respect to the competency issue after the trial had taken place.

The trial then proceeded. The state offered substantially the same evidence introduced at the first trial, except that Parson's written statement was not tendered. No plea of insanity at the time of the crime was entered and no evidence of such insanity was introduced by the defense. The defense introduced testimony of Dr. Voegele solely to prove that the defendant had genuine amnesia at the time of the trial. The defense declined to introduce other evidence of defendant's mental condition because the court ruled that such testimony would open up the issue of the defendant's mental condition and would allow the state to introduce evidence which the defense felt might be prejudicial.

The jury found the defendant guilty without a recommendation for mercy.

Following the trial, the court provided the defense and the state with an opportunity to submit any new evidence with respect to the issue of competency to stand trial. The only evidence submitted was an affidavit of defense counsel that defendant's amnesia prevented him from consulting with counsel as to the twenty-four hour period from the afternoon of January 31, 1964 to the afternoon of February 1, 1964 and from testifying about any facts occurring in that time period. Based upon this affidavit, the trial testimony and the record of the pre-trial proceedings, the court made the following findings of fact and conclusions of law:

1. The evidence adduced at trial was "so clear and convincing that no other reasonable conclusion was possible than that he [Parson] was guilty of murder in the first degree while attempting to commit rape."

2. Parson's amnesia is currently genuine.

3. At the time Parson was apprehended he did not have the amnesia condition as evidenced by his statements given at the time.

4. Observation of Parson during the trial left "no doubt as to his ability to fully understand and to assist counsel in all phases of the case except, of course, the happening of the crime itself." The defendant took extensive notes and following the trial made a comprehensive, intelligent and clear four or five minute statement to the court of why he thought the trial had not been a fair one. He praised defense counsel's work during this statement.

5. There was no conceivable defense Parson "could have constructed without amnesia that he could not have constructed with amnesia by extrinsic evidence through available and known witnesses."

6. There was no evidence in the record to raise an inference that Parson was not legally competent at the time of the commission of the crime and experts were not able to give non-speculative testimony based upon current examinations concerning his mental condition on a particular date six years earlier.

7. For these reasons, Parson was competent to stand trial at the time of the second trial.

8. A defense of insanity at the time of the crime was not raised.

---

tion could provide if functioning," the court added "this, of course, excepts the exact time of the tragedy." It is clear in the context of the case that the court was here indicating that the only thing the defense had been deprived of was the

defendant's present recollection of the events at the time of the tragedy and not that there was no extrinsic evidence available with respect to events at the time of the crime.

9. Under these circumstances, a defendant under Delaware law is presumed to have been sane at the time of the alleged crime.

Parson's second conviction was appealed to and affirmed by the Supreme Court of Delaware. 275 A.2d 777 (1971). Thereafter, a second petition for a writ of habeas corpus was filed in this Court. An order was issued to respondent to show cause why the writ should not issue. Parson's application for an evidentiary hearing in this Court on the issue of his competence to stand trial was denied. The parties have now briefed and argued a number of claims that Parson's second conviction and sentence is constitutionally impaired.

I. DID THE TRIAL OF PETITIONER AT A TIME WHEN HE HAD PSYCHOGENIC AMNESIA VIOLATE HIS RIGHT TO DUE PROCESS OF LAW?

*A. Petitioner's Competence To Stand Trial.*

■ Petitioner's second trial in the state court was occasioned by a holding of this Court that the state court at his first trial improperly failed to hold a hearing upon, and to determine, the issue of petitioner's competency at the time of the first trial. As a result, extensive psychiatric testing was conducted prior to the second trial and an extended hearing on the question of petitioner's competency to stand trial was held. The theory which petitioner here asserts was fully articulated and argued by his counsel at that time. He was given a full and fair opportunity to present any and all evidence he wished to present in support of that theory. The court considered the testimony and petitioner's argument and made both a preliminary pretrial determination of competency and a post-trial final determination of that issue. Findings of fact as well as the court's legal conclusion were recorded.

Under these circumstances the state court's determination must stand unless it applied a constitutionally improper legal standard or unless its factual determination is not fairly supported by the record as a whole. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254.

While I analyze the problem somewhat differently than the learned trial judge who lived with this case from start to finish, I conclude that the legal standard applied by the trial court was a constitutionally permissible one.

■ The conviction of an accused person while he is legally incompetent violates the due process clause of the United States Constitution and state procedures must be adequate to protect that right. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

The Delaware standard for competency to stand trial is set forth in Mills v. State, 256 A.2d 752, 756 (Sup.Ct.1969):

"The defendant's ability to understand the proceedings against him and properly to assist in his own defense are the test of competency to stand trial."

This Delaware standard is identical to that found in the federal statute dealing with competence to stand trial, 18 U.S.C. § 4244. The judicial gloss on the Delaware standard found in Longoria v. State, 3 Storey 311, 168 A.2d 695 (1961) and in this case, is substantially the same as the Supreme Court's interpretation of the federal statute in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960):

". . . [the] test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

The trial court here ruled that, under this standard, current loss of memory of events at the time of the alleged crime does not, by itself, render a defendant incompetent to stand trial. Rather the court concluded that such a loss of mem-

ory should bar prosecution "only when its presence would in fact be crucial to the construction and presentation of the defense." Parson here challenges these rulings, urging the contrary view expressed in the dissent in Wilson v. United States, 129 U.S.App.D.C. 107, 391 F. 2d 460 (1968).

Amnesia is not an unusual phenomenon.[9] As the Supreme Court of Pennsylvania has observed "cases abound with commonly used statements or testimony by a person accused or convicted of murder that 'I don't remember anything'; 'my mind went blank'; 'I blacked out'; 'I panicked and don't remember what I did or anything that happened.'" Commonwealth v. Price, 421 Pa. 396, 218 A.2d 758, 760 (Sup. Ct.1966). Yet there appears to be no case supporting the contention that amnesia precludes competence as a matter of law.[10] While this fact alone is not conclusive on the issue of due process, "it is plainly worth consideration in determining whether the practice 'offends some principal of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Leland v. Oregon, 343 U.S. 790, 798, 72 S. Ct. 1002, 1007, 96 L.Ed. 1302 (1951).

The cases which have decided that amnesia *per se* does not establish lack of competence for trial have proceeded on two distinct theories. One is that, while amnesia may be relevant as a symptom evidencing a present infirmity in the defendant's reasoning capacity, if the defendant has the present ability to understand the proceedings against him, to communicate with his lawyer and generally to conduct his defense in a rational manner, memory or the want

thereof is irrelevant to the issue of competence. See Regina v. Podola, [1960] 1 Q.B. 325 (1959) (Ct.Crim.App.1959); Commonwealth v. Price, 421 Pa. 396, 218 A.2d 758 (1966); United States v. Boylen, 41 F.Supp. 724 (D.Ore.1941) (semble); *cf*. United States v. Borum, 464 F.2d 896 (10th Cir. 1972). The second line of cases proceeds on the theory that lack of memory is relevant to the question of whether the defendant can meaningfully consult with his lawyer and that, while a showing of amnesia is not alone enough, a conviction of an amnesiac cannot stand unless it appears that he was not substantially prejudiced by his impairment. United States v. Chisolm, 149 F. 284 (C.C.S.D.Ala.1906); Wilson v. United States, 129 U.S.App.D. C. 107, 391 F.2d 460 (1968) (Opinion of Wright, J.); United States v. Stubblefield, 325 F.Supp. 485 (E.D.Tenn.1971).

I consider the first approach to be the sounder one. While the test set forth in 18 U.S.C. § 4244 and the *Mills* case speaks in terms of the defendant's ability to assist in his own defense and could perhaps be construed to include the presence of a memory of relevant facts, the interpretation of this test in *Dusky* and *Mills* focuses on the defendant's "present ability to consult with his lawyer with a reasonable degree of rational understanding." These courts were concerned about the defendant's ability to meaningfully exercise his rights under the Sixth and Fourteenth Amendments: his right to challenge jurors, to be informed of the nature and cause of the accusation, to confront the witnesses against him, to summon witnesses in his favor and to have the assistance of counsel. Here, it is undisputed that the petitioner at the time of his second trial

9. Both the psychiatrists for the state and the psychiatrists for the defense referred in the competency hearing to English studies indicating a forty percent incidence of hysterical amnesia among people involved in violent homicides. They explained that the human mind tends to repress from consciousness events that it does not wish to face.

10. "Amnesia: A Case Study in the Limits of Particular Justice," 71 Yale L.J. 109, 116 (1961) states:

"There is no record of any court holding a defendant incompetent to stand trial solely on the basis of amnesia."

A similar search by the court in Bradley v. Preston, 263 F.Supp. 283 (D.C.D. 1967) was likewise fruitless.

could "oversee his lawyer" [11] and make rational decisions with respect to each of these matters. He was, accordingly, competent to stand trial under the applicable test.[12]

This conclusion is supported by the common law development of the concept of competence to stand trial and by a comparison of the amnesiac's trial problems with those of other, concededly competent, defendants. In Regina v. Podola, [1960] 1 Q.B. 325, 355–356 (1959) the English Court of Criminal Appeals was called upon to decide the instant question in the context of a statute which the court found to be a codification of the common law of competence. The court reviewed the early common law authorities and then referred to Russell v. H. M. Advocate, 1946 S.C. (J.) 37:

> "In his opinion upon this preliminary matter (which he tried without a jury) Lord Sorn said that he was quite satisfied that the accused had in fact suffered a loss of memory. He went on to say: 'The next question, and the difficult question, for me is —Does this loss of memory render her unfit to plead.' He continued: 'I have felt that the court in dealing with a plea in bar of trial is primarily concerned with the condition of the accused now at the time of trial and no other time. She is able to instruct, in my opinion, a defence, even though that defence has the peculiarity of including in its features that the accused has forgotten the period of the events dealt with in the charge. . . . I am unable to see that unfairness should follow from this situation. The Crown must prove their case, and must prove it to the satisfaction of the jury, and the accused

can tell the jury that she has no recollection of these events.'"

The court then concluded:

> "We agree with the opinions stated and the conclusions arrived at in the case of Russell. . . . We cannot see that it is in accordance either with reason or common sense to extend the meaning of the word to include persons who are mentally normal at the time of the hearing of the proceedings against them, and are perfectly capable of instructing their solicitors as to what submission their counsel is to put forward with regard to the commission of the crime."

The amnesiac's plight is not unique. We know, for example, that the memory of any defendant "fades" to some degree. The innocent defendant who is arrested several months after the alleged crime and cannot recall where he was on the night in question is not in a dissimilar circumstance.[13] Moreover, we know that defendants may be deprived of direct knowledge of crucial events by circumstances other than loss of memory. "The plight of an amnesiac differs very little from an accused who was home alone, asleep in bed at the time of the crime." [14] Most importantly, we know that the defendant's recollection is only one of many sources of evidence which may permit the reconstruction of a past event and that extrinsic evidence far more valuable to the defense than the defendant's own testimony may be lost by reason of death, destruction or other fortuity prior to trial. Thus, one student of the subject after comparing the position of the amnesiac with other defendants concludes as follows:

> "Once it is recognized that amnesia is present to some degree in everyone and that its effects on the ability of

---

11. Pate v. Robinson, 383 U.S. 375, 388, 86 S.Ct. 836, 15 L.Ed.2d 815 (1965) (Harlan, J., dissenting).

12. While *Dusky* involved the interpretation of a federal statute, one is, of course, justified in assuming that the court would not give the statute a construction which

did not satisfy the requirements of the Constitution.

13. See e. g., Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965).

14. "Amnesia: A Case Study in the Limits of Particular Justice," 71 Yale L.J. 109, 128 (1961).

an individual to assist in his own defense are often hard to distinguish from the disadvantages of many defendants to whom important facts are unavailable for reasons other than amnesia, it should be apparent that it is neither necessary nor appropriate to consider memory failure as a sufficient condition for the interruption of the adjudicatory process to minimize the danger of a miscarriage of justice. The special demands of extraordinary cases should, where possible, be met without losing sight of the fact that a generally effective system of criminal adjudication has been developed around rules of evidence and procedure calculated to insure a workable balance of the interests of the accused, the prosecution, and the court. . . ." 71 Yale L.J. 109, 136 (1961).

In none of these similar situations is the competency of the defendant questioned.[15]

### B. *Other Due Process Considerations.*

■ To say that petitioner's disability is not a matter of competency and is shared by others is not, however, the whole answer. Competent defendants are entitled to due process. The foundation of that concept, fundamental fairness, "inescapably imposes [upon the court] an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples. . . ." Malinski v. New York, 324 U.S. 401, 416, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945).

The administration of justice, of necessity, frequently operates on incomplete data. In those instances where a contention has been made that the absence of relevant evidence impaired the fundamental fairness of a trial, the courts have looked in the first instance to the reasons for the absence and to whether the deficiency could have been remedied or diminished by reasonable procedural adjustments. If, for example, the state has played a role in causing the deficiency, as by delay in prosecution,[16] by deliberately sending a witness beyond the jurisdictional reach of the court's compulsory process [17] or by legislatively declaring a defense witness incompetent to testify,[18] the conviction may violate due process. Similarly, where the lack of evidence could have been cured by a reasonable continuance, the conviction may violate due process.[19]

■■ Where the state has played no role in the loss of evidence and the loss is permanent or irremedial, courts have been reluctant to find due process infringement.[20] Thus, while a state

---

15. In addition to the analysis set forth above, it seems to this Court somewhat anomalous that a question of whether a defendant is competent should turn on an examination of the degree of prejudice or the reliability of the fact finding process. A conviction of an incompetent defendant may not stand even though his guilt has been proven beyond question.

16. Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).

17. People v. Wilson, 24 Ill.2d 425, 182 N.E.2d 203 (1962); United States v. Wolfson, 322 F.Supp. 798 (D.Del.1971) (dictum).

18. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (Texas statute rendering accomplice testimony inadmissible).

19. United States ex rel. Drew v. Meyers, 327 F.2d 174 (3rd Cir. 1964).

20. United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) (government's inability to produce tape recordings made by defendant and government witness after "an earnest effort was made to locate them," *id.* at 355, 89 S.Ct. at 533, held not to rise to level of due process violation); United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971) ("criminal conviction otherwise based on sufficient evidence may be permitted to stand so long as the Government made 'earnest efforts' to preserve crucial material and to find them once a discovery request is made." *Id.* at 651). *But see,* United States v. Heath, 147 F. Supp. 877 (D.Hawaii 1957) (loss by government of evidence put in its possession

may not legislatively bar a critical defense witness from testifying, a conviction is not infirmed where such a witness invokes the Fifth Amendment and refuses to testify.[21] Similarly, where a defense witness dies prior to trial, the conviction will withstand attack.[22] It is possible to read the lost evidence cases as holding that in this context the Fourteenth Amendment does not provide "complete insulation against the 'slings and arrows of outrageous fortune', which may strike anyone at any time and are unfortunately incidental to life itself",[23] and, accordingly, that the test is solely whether the state gave the defendant the fairest trial possible under the circumstances. Under this test the petitioner's conviction would clearly be valid. It is undisputed here that the government had nothing to do with petitioner's amnesia and that a continuance would not have resolved the problem. All of the government's evidence was revealed to defendant in the first trial and both the prosecution and the court went out of their way during the second trial to assist the defense in every way possible.

■ Where the state is blameless and where it has the burden of proving each issue in contest beyond a reasonable doubt, I agree with Lord Sorn that fundamental fairness does not require that prosecution cease. Where, as petitioner claims is the case here, the defendant has the burden of proving a relevant and debatable factual issue by a preponderance of the evidence,[24] the question of fundamental fairness may become more difficult. In such a context, a court may have a responsibility to look beyond the conduct of the state. Due process "cannot be imprisoned within the treacherous limits of any formula",[25] and it is at least conceivable that a case might arise in which, despite the scrupulous conduct of the state, the result would "shock the conscience."[26] This is not such a case, however.

■ After finding on undisputed facts that Parson had a rational understanding of the charge and the proceedings against him and was fully capable of conferring rationally with his attorneys during the trial, the trial court looked, before and after trial, to the overall circumstances to assess the significance of defendant's amnesia and whether his lack of recollection had any substantial impact upon the trial. The court concluded that if there had been a meritorious defense, (1) that defense could have "been constructed from sources extrinsic to the defendant," and (2) that the record in the case would not be barren of credible support for any defense. The court's approach was a reasonable one and the record amply supports its factual findings.

■ Thorough investigation on the night of this crime produced evidence which enabled the defendant, the court and the jury to reconstruct a clear picture of the events that had transpired. That evidence left no doubt whatever that Kathleen Rae Maull was

by defendant denied defendant ability to make his defense and precluded trial.)
A defendant is not denied his Sixth and Fourteenth Amendments rights merely because a witness is "lost" to him because he is beyond the territorial reach of the court's process where the state has played no role in the absence of the witness from the jurisdiction. United States v. Greco, 298 F.2d 247 (2nd Cir. 1962) cert. denied, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).

21. *Compare* Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) *with* Myers v. Frye, 401 F.2d 18 (7th Cir. 1968).

22. E. g., United States v. Rhoades, 398 F. 2d 655 (7th Cir. 1968).

23. United States v. Rhoades, 398 F.2d 655, 658 (7th Cir. 1968).

24. Under Delaware law, insanity is an affirmative defense which the defendant must prove by a preponderance of the evidence. Longoria v. State, 3 Storey 311, 168 A.2d 695 (Del.Sup.1961).

25. Joint Anti-Fascist Refugee Com. v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951).

26. Rochin v. Cal., 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

attacked in an attempted rape, resisted strongly, was badly beaten and, ultimately, was killed. It also left no doubt whatever that Parson was the one guilty of the aggression. Accordingly, there is no doubt whatever that Parson, with or without amnesia, could have mounted no alibi or other defense based upon the absence of any essential element of the crime charged.

Nor was the defense impaired to any significant degree in pursuing any possible defense of insanity at the time of the crime. Parson and his attorney were on notice as of February 1, 1964 of the necessity of preparing a defense to a first degree murder charge. Parson's memory was then intact. Thereafter they were provided with the resources necessary to develop any possible defense of insanity at the time of the crime. While petitioner claims to have established that his amnesia precluded the formulation in 1969 of expert opinions with respect to his condition on January 31, 1964, this, even if true,[27] would not entitle him to the relief he now seeks. There is nothing in the record to indicate that such an opinion could not have been formulated in 1964. On the contrary, the record indicates that Dr. Byrne could and did make an evaluation on this score. If his analysis had provided a basis for an insanity defense, his findings would have been memorialized in admissible form at the first trial.[28] His testimony, however, provided no support for such a theory.[29]

27. While the psychiatrists in 1969 could not speak to Parson's mental condition on the crucial night in 1964 with "reasonable medical certainty," it was not established that this inability was attributable to petitioner's amnesia. Dr. Anstreicher, whose testimony on the point was accepted by the court in its opinion, testified that the reason he could not speak with reasonable medical certainty was not because of amnesia but rather because of the passage of time between the night in question and the date of his first examination.

Dr. Anstreicher was able to speak to the mental condition of Parson at the time of the crime with "reasonable medical probability." Dr. Orne's testimony did not significantly differ:

"Q I will ask it in my way and that is whether or not you could determine— whether or not you would be in a better position to determine [condition of the mind at the time of the crime in the absence of amnesia]?

A The retrospective diagnosis of whether a psychosis existed at some time is always a matter of judgment. And whether a psychiatrist feels he can make this judgment depends upon his willingness to make certain kinds of judgment. If you phrase that in terms of 'could you be reasonably certain' I would say you would have great difficulty being certain about the state of a mind of an individual at some specific time a long time ago. And you would have to make a judgment about it."

Dr. Voegele testified that whether he would be able to speak to the point absent amnesia would depend upon what Parson would tell him if he could tell him. All three psychiatrists testifying at the competency hearing agreed that given their observations it would be "most unlikely" that a psychotic state had existed at the time of the crime on the evening of January 31, 1964 and had terminated before February 1, 1964, the date upon which Parson's memory gap ceases.

28. It is well settled in Delaware as elsewhere that testimony admitted at a prior trial with appropriate opportunity for cross-examination is not made inadmissible at a later trial either by the Constitution, Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); California v. Green, 399 U.S. 149, 90 S. Ct. 1930, 26 L.Ed.2d 489 (1970) or by the hearsay rule, Rogers v. Rogers, 66 A. 374, 6 Pennewill's (Del.) 267, (Del.Super. 1907); Gibson v. Gillespie, 4 W. W. Harrington (34 Del.) 331, 152 A. 589 (Del.Super.1928).

Parson's current counsel intimate that the study of the defense psychiatrist was not an entirely satisfactory one. Dr. Byrne was a qualified psychiatrist who had the benefit of Dr. Weintraub's psychological testing and saw Parson on at least three different occasions. I find no evidence in the record to support defense counsel's intimations of inadequacy. None of the numerous professionals who testified at the competency hearings criticized the quality of Dr. Byrne's work. If Dr. Byrne had foreseen the unforeseeable, and had realized that others might subsequently be called upon to formulate an opinion

29. See note 29 on page 1076.

Moreover, if a meritorious insanity defense had existed, support would have been available at the second trial from sources other than Dr. Byrne. In addition to the reconstructed picture of events of the evening of January 31, 1964, the defense had available to it the following resources:

1. Parson's memory of past events in his life intact except for a period commencing a few hours before the crime and ending a few hours after his arrest, with a few isolated remembrances during this period.

2. A substantial number of people, including several physicians who observed and talked with Parson within a brief period following the commission of the crime.[30]

3. Parson's mother, his wife and his companion through most of the day of January 31, 1964.

4. Thorough personal histories of Parson's life.

5. Exhaustive psychological tests and psychiatric evaluation on the basis of the above data and personal observation of Parson over a period of years, including studies made in 1964.

■ Wholly aside, however, from what would have been available to the defense in 1969 in the way of admissible evidence, it is not enough in this context for petitioner to say that it is possible that he may have been legally insane at the time of the crime. Used in the literal sense of the term, anything in human life is "possible." As Judge Leventhal put it in Wilson v. United States, 129 U.S.App.D.C. 107, 391 F.2d 460 (1968):

"The matter must be put in terms of what is reasonable; obviously it is always *possible* that the defendant, if not deprived of memory, could have taken the stand and used words which, if believed, would have constituted some sort of defense. For example, it is possible that the defendant might have testified that his dead companion had used physical coercion. . . .

It is always possible that a defendant could gain an acquittal by perjur-

---

based in part on his study, he might well have recorded every observation in detail. But any deficiency in this respect clearly does not demonstrate that Parson's position was such in 1969 that his trial by the State of Delaware violated due process. *Cf.* State v. Severns, 184 Kan. 213, 336 P.2d 447 (1959).

29. Dr. Byrne testified at the first trial but only as to the existence at that time of amnesia. During the course of the cross-examination the following occurred:

"Q Doctor, particularly in this case, what would cause repression?

MR. RAYSOR: May I object to the question and ask that counsel approach the bench.

(At the bench):

MR. RAYSOR: Your Honor, I object at this point because of the line of questioning the Attorney General is following. He is skirting on psychological reasons for this inability to recall; and I simply want to caution the prosecution that if they do, they are opening the door wide open to his full psychological and psychoanalytical condition as Doctor Byrne found it."

(Tr. 1068–1069).

30. As far as the competency hearing was concerned, the defense had available to it the testimony of two defense attorneys who talked with Parson while his memory was still intact. After the first habeas corpus proceeding in this Court, the state trial court relieved Parson's attorneys and appointed new ones. One had represented Parson since February 4, 1964. The other attorney who had been appointed to represent Parson on February 1, 1964 had been replaced prior to the habeas corpus proceedings. The express purpose of the trial court relieving defense counsel of responsibility in the case was to enable them to testify at the contemplated competency hearing. They were never called. Since their testimony was never tendered we do not know whether such testimony would have been ruled admissible at trial under a traditional exception to the hearsay rule (e. g. McCormick, Law of Evidence, §§ 269, 271 (1954)) or under an exception created to fit the unusual circumstances of this case. See Amnesia: A Case Study in the Limits of Particular Justice, 71 Yale L.J. 109, 136 (1961). This Court is unwilling to assume, however, in such circumstances that probative evidence of this kind would have been rejected if tendered.

ing himself, or more conscionably by presenting such a sympathetic figure on the witness stand that the jury would have used the mercy-dispensing power that it has in fact though not in law. But such possibilities or prejudice, however realistic, do not suffice to prohibit the entry of a judgment on a verdict of guilty."

I agree with the trial court's conclusion that if an insanity defense had been a reasonable possibility, the record in this case, contrary to the fact, would show some credible basis for such a defense.

 As previously noted, the court concluded from all of the testimony that while Parson was suffering from personality problems of many years duration, there was no evidence in the record which raised an inference that he was not responsible at the time of the alleged offense. This is a fair reading of the record. A contrary conclusion is not dictated by the testimony of Dr. Weintraub, relied upon heavily by petitioner, that Parson's "ability to distinguish right from wrong . . . can be emotionally impaired and prove unequal to controlling his behavior under stress." Dr. Weintraub's testimony does not support petitioner's position for at least three reasons. First, Dr. Weintraub was not asked to, and did not, express an opinion based on the known facts about the night of January 31, 1964, that Parson could not distinguish between right or wrong or that he was unable to conform his conduct to the right.[31] Second, to the limited extent

Dr. Weintraub speculated about the state of Parson's mind on January 31, 1964 he hypothesized that Parson was "under the influence of alcohol." If true, this would provide no basis for a defense of insanity.[32] Finally, Dr. Weintraub's theory was that Parson, at the time of his examination in 1964, as well as at the time of his examination in 1969, was suffering from psychosis, namely schizophrenia: paranoid type. Parson's own psychiatrist, however, based on Dr. Weintraub's study as well as his own examinations, expressly rejected this diagnosis, as did each of the other psychiatrists who testified at the final competency hearing.

In short, put in terms of the "reasonable" there was no meritorious defense in this case which Parson was precluded from putting forth by virtue of his amnesia.

 There is an additional related reason, however, why petitioner's "inability to prove insanity" argument does not warrant the relief he seeks. The trial court's ruling on this argument rested in part, and the Supreme Court of Delaware's ruling rested in whole, on the fact that the defense neither served notice of an insanity defense as required under Delaware law nor tendered any evidence at trial in support of such a defense. They held that in such circumstances Delaware law presumes a defendant to have been sane at the time of the alleged crime.

Petitioner does not contest the constitutionality of this presumption as applied generally. As Justice Frankfurt-

---

31. Delaware's test for the defense of insanity at the time of the crime is as follows:

"... to exempt a person from responsibility for a crime, the mental illness must be of such a character as to deprive him of the capacity to distinguish between right and wrong in respect to the act committed or to deprive him of sufficient will power to choose whether he would do the act or refrain from doing it. ..."
Longoria v. State, 3 Storey 311, 168 A. 2d 695, 700 (Sup.Ct.1961).

32. Under established Delaware case law insanity produced as a result of "long continued indulgence", State v. McGonigal, 5 Del.Rpts. (5 Har.) 510 (Del.Super. 1854), in the consumption of alcohol is a defense to a criminal charge. *Id.* But where one voluntarily makes himself drunk and a criminal act results from a "mere frenzy of drunkenness" culpability is not affected. State v. Thomas, 1 Houst.Crim.Cas. 511 (Ct. of Oyer & Terminer 1877); State v. Davis, 14 Del. Rpts. (9 Houst.) 407, 33 A. 55 (Ct. of Oyer & Terminer 1885).

er said in Leland v. Oregon, 343 U.S. 790, 804, 72 S.Ct. 1002, 1010, 96 L.Ed. 1302 (1951) (dissenting opinion):[33]

". . . [The Constitution] does not preclude States from utilizing common sense regarding mental irresponsibility for acts resulting in homicide—from taking for granted that most men are sane and responsible for their acts. That a man's act is not his, because he is devoid of that mental state which begets culpability, is so exceptional a situation that the law has a right to devise an exceptional procedure regarding it. Accordingly, States may provide various ways for dealing with this exceptional situation by requiring, for instance, that the defense of 'insanity' be specially pleaded, or that he on whose behalf the claim of insanity is made should have the burden of showing enough to overcome the assumption and presumption that normally a man knows what he is about and is therefore responsible for what he does, . . ."

■ Petitioner argues, however, that a state may not constitutionally rely upon a presumption of this character where (1) there is evidence which indicates "the possibility" of insanity at the time of the crime and (2) the defendant is precluded by amnesia from developing this possible defense. The argument is similar to petitioner's lack of competency argument and must fail for the same reasons. This Court would have no logical basis for holding that "amnesia" in and of itself should preclude the state from relying on the "common sense" proposition that "most men are sane and responsible for their acts."[34] And, as heretofore indicated, there was no showing here of a reasonable possibility of an insanity defense. If speculation of the kind petitioner pressed upon the trial court precluded

application of the presumption, the exception thus created would devour the rule; due process does not require such a result

\* \* \*

## II. WAS PARSON DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY?

The questioning of the prospective jurors began on Monday morning, October 28, 1969 and was completed on Thursday, November 6, 1969, some nine and one-half trial days and some 1,582 pages of transcript later. One hundred and ninety-seven veniremen were questioned. Of these, fifteen were seated as jurymen (one was subsequently excused for personal reasons), twenty-three were preemptorily challenged (twenty by the defense and three by the state), eight were discharged by the Court for personal reasons not relevant to the issues here, twenty-three were discharged for cause concerning their feelings as to capital punishment, and one hundred and twenty-eight were discharged for cause as a result of findings that they had previously reached an opinion as to the defendant's guilt and were unable to sit as impartial jurors.

Each of the twelve jurors who ultimately decided the case swore unhesitatingly that they had formed no opinion with respect to Parson's guilt or innocence. Each testified that he or she was aware from reading newspapers or from hearing conversations of others that the case existed and that there had been a prior trial. This awareness was casual, the factual knowledge of each juror was very general, and none had any knowledge of the state's evidence or of any details of the alleged crime. Four had heard others in the community express opinions that Parson was guilty. All testified without qualification that their

---

33. Justice Frankfurter dissented from the holding of the Court that Oregon could constitutionally place upon the defendant the burden of proving his insanity beyond a reasonable doubt.

34. The present record does not suggest that any relationship exists between hysterical amnesia and the condition of an amnesiac's mind at the time of the prior act which he has repressed.

prior exposure to the press and others in the community would not preclude them from rendering a fair and impartial verdict based solely on the evidence presented at trial. Each was examined at length by defense counsel without interference or criticism from the court. The court found as a fact that each would be impartial.

Five of these twelve jurors were not challenged by the defense. None were challenged on a ground relating to their prior knowledge of facts concerning the case or to contamination by the press.[35]

Only one juror was challenged for any reason relating to prior communications concerning the case. This juror, Juror No. 9, was challenged on three grounds, only one of which is relevant to the petitioner's arguments here. He had heard several opinions expressed by others that Parson was guilty and none that he was innocent. The juror testified, however, that the opinions of others would not affect his judgment and that he could "go into the case with an open mind." The court ruled:

> "Learning, also, that his daughter is approximately the same age as Miss Maull, the victim in this case was, I paid particular attention to the manner in which this witness answered the questions, his demeanor on the stand, and the directness and firmness of his answers and, from my observations, I feel very strongly that this man would be a nonprejudiced, fair, and impartial juror. I, therefore, decline to rule in your favor and ask the

State, as a result, if it is prepared to challenge or swear."

The sole question before this Court with respect to the selection of a jury is whether petitioner was denied the right to an impartial jury guaranteed to him by the Sixth and Fourteenth Amendments of the United States Constitution. *Cf.* Vandergrift v. United States, 313 F.2d 93 (9th Cir. 1963). The proper focus is accordingly on the twelve jurors who decided Parson's fate. While this does not mean that the experience of the court with the other veniremen questioned is wholly irrelevant, it does mean that the significance of that experience is primarily as a context in which to evaluate the examinations of, and the court's rulings on, the twelve who in fact served. See e. g., Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L. Ed.2d 751 (1961).[36]

Petitioner's attacks on the selection of the jury fall within three groups: (1) claims that actions of the trial court obstructed defense counsel in bringing to light the bias which petitioner feels was demonstrated by the large number of veniremen who conceded they could not fairly judge; (2) claims that the court erred in failing to discharge two jurors for cause because of bias in favor of police testimony and (3) claims that thirteen prospective jurors were improperly discharged for cause as a result of their views on capital punishment.

Most prominent among the first group of claims are the complaints that the court unduly limited the questioning of

**35.** Three jurors were challenged by the defense because they disapproved of excessive drinking; there was no evidence at trial of excessive drinking. One was challenged because, although a layman, he had become a town alderman one month before and had occasionally sat as a judge on cases involving violations of town ordinances. Two were challenged because they knew several members of the state police, none of whom testified at trial. One was challenged because of his views on capital punishment. Two were challenged because of views regarding the credence to be given police testimony. The court's rulings on all except the last of these categories of challenge are not now attacked by the petitioner. That category is discussed subsequently.

**36.** Petitioner complains, for example, that errors of the trial court in the course of the questioning of a few veniremen not selected for service required him to challenge them preemptorily. Complaints of this kind, even if justified, do not raise questions of constitutional proportion where, as here, the court's handling of the jury selection as a whole was consistent with traditional notions of fair play.

defense counsel and, by instructing the prospective jurors prior to the questioning of counsel on the qualifications and role of jurors, in effect ordered them not to reveal any bias. I have reviewed all of the court's rulings with respect to the scope of questioning. Each was within the scope of permissible discretion which must be accorded a trial judge in this context.

■ ■ The preliminary instructions of the court were legally accurate and were reasonably considered by the trial judge to be necessary in order that the veniremen understand the questions of counsel. Where the issue is whether laymen will be able to properly perform their assigned task, it is clearly permissible to tell them what their assigned task would be if selected. Moreover, the record affirmatively suggests, as one would expect, that the veniremen did not interpret the court's instructions as a directive to violate their oath. The trial judge created an atmosphere in which the prospective jurors spoke freely of their views and their prior exposure to information concerning the case. As previously noted, one hundred twenty-eight of them were discharged because they had formed an opinion and could not judge objectively. Almost all of these readily admitted their bias. The bias of the other few was detected in the course of the lengthy questioning permitted by the court.

The court was confronted with a difficult task. This was one of those situations where the Supreme Court has recognized it is impossible to find jurors "totally ignorant of the facts and issues involved." Irvin v. Dowd, *supra,* at 722, 81 S.Ct. at 1642. Many had concededly formed opinions rendering them unfit to serve. Others clearly had had only casual contact with the case and had formed no opinion. Accordingly, the court here was called upon to separate those, in Chief Justice Marshall's words, with "light impressions which may fairly be supposed to yield to the testimony that may be offered" from those

with "strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them." United States v. Burr, 25 F.Cas. 49, 51 (No.14,692g) (C.C.D. Va.1807).

The trial judge performed this difficult task admirably, erring if at all in the petitioner's favor. As previously noted only one of the twelve jurors was even challenged by the defense for possible preconceived notions about the case. That challenge was insubstantial and the court's ruling thereon was clearly not "manifest" error. Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244 (1878); Spies v. Illinois, 123 U.S. 131, 8 S.Ct. 21, 31 L.Ed. 80 (1887); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Hopt v. Utah, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1886).

Petitioner's second group of claims is grounded upon the proposition that "a defendant cannot be fairly tried by a juror who would be inclined to give unqualified credence to a law enforcement officer *simply because he is an officer.*" Chavez v. United States, 258 F.2d 816, 819 (10th Cir. 1958). A number of courts have relied upon this proposition in holding that it is reversible error in some contexts for a trial court to refuse to question prospective jurors on this subject when requested. Sellers v. United States, 106 U.S.App.D.C. 209, 271 F.2d 475 (1959); Brown v. United States, 119 U.S.App.D.C. 203, 338 F.2d 543 (1964). Here the trial court did permit questioning in this area and, indeed, dismissed one juror for cause on this ground.

Juror No. 8 testified as follows:

"Do you feel that a police officer, by virtue of the fact that he is a police officer, is any more worthy of belief than any other witness who swears to tell the truth?

A. Yes.

Q. You would more readily believe a police officer than you would another witness?

A. Yes. Do you want to know why?

Q. Yes.

A. Well, he is trained whereas just an individual like I am is not trained in those matters, and he might detect something that just an ordinary person wouldn't detect.

THE COURT: Mrs. Mumford, how about if he is testifying with respect to matters about which he is not trained?

THE PROSPECTIVE JUROR: Then he would be just like anyone else.

\* \* \* \* \* \*

Q. Do you know any reason, which we may or may not have discussed already, which would prevent you from being an impartial juror in this case?

A. No." (Tr. 1326–1327) [37]
Juror No. 11 testified as follows:

"Do you feel that a police officer, by virtue of the fact that he is a State Police officer, is any more worthy of belief than any other witness who would testify?

A. I don't know what you mean by that.

Q. Would you believe a police officer's testimony over that of any other witness?

A. I think he would—I think I would have more trust in him than I would another person. I don't know why, but I think I would.

\* \* \* \* \* \*

In other words, would you believe him just because he is a police officer more than anyone else when both of them are under oath?

A. No.

Q. Now, you are answering me differently than you answered Mr. Tucker.

A. No. Well, I figure when a person gets under oath, they are going to be honest anyway.

Q. To an equal degree?

A. Yes." (Tr. 1463–1470)

The court concluded from its observation of this prospective juror that she had been "confused initially" by defense counsel's question and gave credence to her later testimony.

■ ■ Abstract questions of this kind are difficult for a juror to understand and answer meaningfully. Moreover, they frequently produce responses which are poor indicia of the manner in which the juror would evaluate any particular police testimony. This does not mean such questions are improper; it does mean that the trial court is entitled to weigh the responses in the light of the juror's demeanor and his responses to other questions. The quoted testimony, particularly when read in the context of all the questioning, does not indicate that these jurors would give "unqualified credence" to police testimony. Here again there was no "manifest error."

Finally petitioner asserts that thirteen jurors were discharged for cause in violation of the rule established by Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Boulden v. Holmen, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970). In those cases the Supreme Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777. Petitioner reads too much into this holding.

---

**37.** The third venireman whom petitioner unsuccessfully challenged on this ground testified in similar fashion.

In *Witherspoon,* the court commenced its analysis of the question before it with the following comment:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. . . ." Witherspoon v. Illinois, 391 U.S. 510, 513, 88 S.Ct. 1770, 1772, 20 L.Ed.2d 776 (1968).

Later it noted:

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case." Witherspoon v. Illinois, 391 U.S. at 522–523 n. 21, 88 S.Ct. at 1777.

 In this case each of the thirteen jurors excused testified unequivocally that he would either automatically vote against the imposition of capital punishment or that his attitude towards the death penalty would prevent him from making an impartial decision as to the defendant's guilt. Each of the thirteen was correctly discharged under the standards set forth in *Witherspoon, Boulden* and *Maxwell.*

 Moreover, even if one or more of these thirteen veniremen had not thus responded to the questioning, it would not follow that petitioner would be entitled to the full relief he seeks. As the above quotation from *Witherspoon* indicates, the holding of this trilogy affects only the *sentence* and not the *conviction.* In *Witherspoon* the court expressly rejected the argument that a jury selected in the manner condemned by the court "must necessarily be biased in favor of conviction." 391 U.S. at 516, 88 S.Ct. at 1774. Here, as in that case, "it has not been shown that this jury was biased with respect to the petitioner's guilt." 391 U.S. at 518, 88 S.Ct. at 1775. I have concluded for reasons hereinafter set forth which are wholly independent of the *Witherspoon* doctrine that the death penalty here imposed cannot constitutionally be carried out. In this context, therefore, the *Witherspoon* issue becomes moot. Moore v. Illinois, 408 U. S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

III. DID THE TRIAL COURT'S DENIAL OF A CHANGE OF VENUE VIOLATE THE CONSTITUTIONAL RIGHT TO A FAIR TRIAL?

At trial defendant moved for a change of venue from Sussex County to New Castle County on the ground that there existed in Sussex County such prejudice against him as would make it impossible for him to receive a fair trial. In support of this motion defendant introduced nineteen affidavits of local residents all of which asserted that petitioner could not get a fair trial in Sussex County. All of these affidavits were executed prior to petitioner's first trial in 1964. Additionally, defendant supplied the court with copies of all articles in the News Journal, a Wilmington (New Castle County) newspaper of state-wide circulation pertaining to the crime and trials of defendant.[38]

38. The clippings which were supplied to the state court, were not made a part of its record. These clippings have been submitted to this Court and by stipulation of the parties have been made a part of the record here.

■ The trial judge, after considering the documents presented and hearing the parties at oral argument, found that there would be a fair trial in Sussex County. (Tr. 794).[39] After an independent examination, I conclude that the record fairly supports this determination.

Petitioner relies largely on Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) which he asserts stands for the proposition that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial the judge should . . . transfer [the case] to another county not so permeated with publicity." Id. at 363, 86 S.Ct. at 1522. While the Supreme Court there indicated that identifiable prejudice to the accused need not be shown if the totality of the circumstances raises a probability of prejudice, Id. at 352, 86 S.Ct. 1507, here the totality of the circumstances showed no reasonable likelihood of prejudice to the defendant.

The proceedings in the Sheppard case were characterized by the Supreme Court in this way:

"For months the virulent publicity about Sheppard and the murder had made the case notorious. Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial. In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people. Furthermore, the trial began two weeks before a hotly contested election at which both chief prosecutor, Mahon and Judge Blythin were candidates for judgeships."

At the trial itself, "bedlam reigned at the courthouse . . . and newsmen took over practically the entire courtroom hounding most of the participants in the trial especially Sheppard." Id. at 355, 86 S.Ct. at 1518. The Ohio Supreme Court characterized the trial as "a Roman holiday." 165 Ohio St. 293, 135 N.E.2d 340 at 342. The Supreme Court referred to the trial as a "carnival." Sheppard v. Maxwell, supra, 384 U.S. at 358, 86 S.Ct. 1507. It appears that only "after the case was submitted to the jury . . . was [it] sequestered for its deliberations." Id. at 349, 86 S.Ct. at 1515. Thus, during the trial the jury had access to the highly inflammatory and emotional information that was then flooding all of the communications media. While the trial judge in Sheppard "suggested" to the jury that it not read about the case in the newspapers, he specifically refused to instruct them not to do so.

This case is wholly different. Unlike the parody of a trial received by the defendant in Sheppard, petitioner's trial proceeded from start to finish in an orderly, calm and deliberate atmosphere. The jury was sequestered for the entire trial, and instructed not to discuss the case with others or to read about it in the newspapers. In Sheppard and in other cases of its kind, see Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), trial followed close after the commission of a brutal crime that worked to enrage the community. Here the trial followed by some five years the commission of the offense.

Petitioner relies heavily on the results of the voir dire to show the "pattern of deep and bitter prejudice," Irvin v. Dowd, supra at 727, 81 S.Ct. at 1645, against him that allegedly existed in Sussex County. While the voir dire did demonstrate that many Sussex County people had formed opinions regarding Parson's guilt, it did not evidence the kind of general hostility which might

39. The trial court so concluded prior to trial in ruling on the original motion for a change of venue. Upon renewal of that motion, after the voir dire of the jury, he stated that this conviction had been reinforced by the voir dire proceedings

cast doubt on the qualifications of those who served.

Nor does a review of the newspaper clippings indicate the existence of deeply felt local prejudice that might reasonably be thought to put in question the ability of the state to give petitioner a fair trial. There was no inordinate amount of newspaper publicity given to this case. As would be expected there were flurries of news articles following the crime at the time of the first trial and during the first habeas corpus proceeding. There were relatively few articles preceding the second trial and these concerned continuances and other procedural matters rather than the details of the crime. The news articles which were published were straightforward news accounts and were not inflammatory. Indeed, the newspapers, in response to a handful of letters to the editor critical of this Court's first decision in early 1968, editorially emphasized the importance of according to Parson his constitutional rights.

When the state court proceeded to trial in Sussex County it had before it a case in which (1) the press had been responsible, (2) emotions had had five years to cool, (3) the state, with one unfortunate exception in early 1968, had not generated the pre-trial publicity, (4) the statewide circulation of the newspaper publicity provided no reason to believe that a transfer of venue to New Castle County would have accomplished anything and (5) the jury selection process had produced twelve jurors and two alternates who had neither significant knowledge about the case nor preconceived notions about the defendant's guilt or innocence. The trial court, in these circumstances, did not err in denying petitioner's motion for a change of venue. See Koolish v. United States, 340 F.2d 513 (8th Cir. 1965); Estes v. United States, 335 F.2d 609 (5th Cir. 1964); United States v. Bonanno, 177 F.Supp. 106 (S.D.N.Y.1959); 1 Wright, Fed.Prac. & Proc. (Crim.) § 342 (1969).

## IV. DID THE ADMISSION INTO EVIDENCE OF PETITIONER'S ORAL STATEMENTS VIOLATE DUE PROCESS?

Petitioner's next two arguments require a brief statement of the undisputed facts relating to a portion of the police investigation following discovery of the crime.

Mr. and Mrs. Zak, the couple for whom Kathleen had been babysitting, returned to their home shortly after 10:00 P.M. There were unmistakable signs of a recent violent struggle. The living room floor and the kitchen floor and walls were spattered with quantities of wet blood. Pieces of Kathleen's clothing, including the dungarees she had been wearing, were on the premises, but she could not be found.

The police arrived at approximately 10:45 P.M. Shortly thereafter they were informed by a passerby that Parson's car, which was easily recognizable because of several distinctive characteristics, had been parked in front of the Zak home between 8:30 and 9:00 P.M. that evening. As a result of this information Sgt. Purdy and Trooper Reynolds proceeded to Parson's home. They arrived at 11:37 P.M. and immediately observed Parson's car outside his home. The "whole trunk area of the car and fender" were covered with what appeared to be blood. Purdy saw Parson in the driver's seat of the car. Purdy lived about a quarter of a mile away across a field and he and Parson had known each other for four to five years.

Purdy took his service revolver from the holster and went to the left side of the car. He observed defendant trying to start the car. When he arrived at the front left door he said through the open window, "Norman, come out of the car very slowly and keep your hands where I can see them." Parson got out of the car unassisted, with his hands raised. As he emerged he said, "Mr. Purdy, I am in a mess of trouble."

As soon as Parson was out of the car, Purdy noticed that his right hand was bandaged and that blood was "dripping" from this bandage. Purdy immediately commenced first aid. He took a belt and applied it as a tourniquet around Parson's arm between the shoulder and the elbow. Except for his hand, Parson appeared normal. He expressed no concern about his wound and there was no conversation between the two while the tourniquet was applied.

About three minutes after the arrest and while the first aid was still being administered, Detective Brickner arrived. He too noticed the blood on the rear of the car. He took the keys from the ignition and started back towards the trunk of the car. As he approached the trunk with the keys in hand, Parson said, "She is not in there. She is in a ditch. I will show you where." As of this point, there had been no conversation between Parson and the police other than that quoted above.

Following the first aid, Parson led the police to Rabbits Ferry Bridge where the body of Kathleen Rae Maull was found. Sgt. Purdy stayed at the site for two to three minutes and then took Parson to the Beebe Hospital to have his hand treated. They arrived at the hospital at approximately 12:15 A.M. Upon admission, Parson was asked by Trooper Foster to sign a permission slip to permit the doctor to extract a sample of blood from him and was told that this would determine the amount of alcohol he might have in his system at that time. He signed the paper. Upon admission, Parson was suffering from shock. He was treated therefor during the first one-half to three-quarters of an hour and recovered fully as a result of

that treatment.[40] Parson's hand was also treated. He was released by the Beebe Hospital at 1:51 A.M. and was then transported to State Police Troop No. 4 in Georgetown, Delaware. He arrived at Troop 4 at approximately 2:15 A.M. At approximately 2:30 A.M. he was asked to disrobe and was given a pair of dungarees and a dungaree jumper to put on. His trousers and shoes were retained as evidence and forwarded to the FBI laboratory.

Thereafter Parson was asked about and related the prior events of that evening. He dictated a statement which was transcribed by one of the questioning officers and signed by Parson. This statement was not utilized by the state in the second trial and there was no detailed voir dire testimony at the second trial concerning the period from 2:30 A.M. to 7:30 A.M.

At 7:40 A.M. on February 1, 1964, Parson was given a comb and asked to comb his pubic area. He did this while Trooper Kuratle held a white paper underneath the area to catch the combings. Immediately thereafter Parson was asked to lay his hands on the desk and Kuratle took a penknife and took the scrapings from underneath Parson's fingernails.

Parson was taken before a magistrate at 9:25 A.M. on February 1, 1972, in Nassau, Delaware.

After the voir dire on the state's tender of Parson's oral statements at the time of his arrest, the trial court found that Parson was in normal control of his faculties, that there had been no interrogation or other coercion to speak, and that the statements had been spontaneously and voluntarily made. The statements were then admitted.

40. There was no testimony regarding this condition and its treatment at the second trial. Defense counsel referred to the testimony of Dr. Tormet given at the first trial, but did not introduce that testimony into evidence. The court, however, accepted this reference to the prior testimony and considered it in ruling upon the admissibility of the evidence challenged.

Dr. Tormet testified at the first trial that Parson, upon arrival at the hospital, was suffering from "mild to moderate" shock which he treated with intravenous injection of Dextran. He further testified that Parson recovered under this treatment and upon release was suffering no "lingering or side effect" from the shock or the treatment.

Petitioner here attacks this ruling on two grounds: (1) that a consideration of the overall circumstances, including the fact that Parson had not been advised of his constitutional rights, demonstrates that the statements were not the product of "free will," and (2) that the second statement was coerced by a threatened illegal search of Parson's car.

■■■■ This case was commenced prior to the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) and that case does not control the question of the admissibility of Parson's in-custody statements at the second trial even though that trial was held after the *Miranda* decision. Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969). It is nevertheless true, as petitioner argues, that long before *Miranda* the Fourteenth Amendment forbade the use of all incriminating statements which were not the product of the free will of the confessor. See e. g., Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L. Ed.2d 760 (1961). Under these cases, "the question [is] whether the will of the defendant had been overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances." Procunier v. Atchley, 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1970). A failure to advise defendant of his constitutional rights is a relevant factor in determining the ultimate issue of voluntariness as are all other circumstances surrounding the giving of the statements. Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

■■■■ The trial court's determination here is fairly supported by the evidence. The first statement is a classic example of the kind of spontaneous declaration which the courts have recognized as voluntary and, therefore, admissible. See e. g., Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);[41] Bosley v. United States, 138 U.S.App.D.C. 263, 426 F.2d 1257 (1970); United States v. Littlejohn, 441 F.2d 26 (10th Cir. 1971); Payne v. United States, 409 F.2d 1350 (5th Cir. 1969); United States v. Godfrey, 409 F.2d 1338 (10th Cir. 1969); *cf.* United States ex rel. Herhal v. Anderson, 334 F.Supp. 733 (D.Del.1971). It was made by Parson of his own free will before any opportunity was presented for advice of rights, for interrogation, or for any other, more subtle form of coercion.

■■■■ Petitioner's argument with respect to the second statement is also without merit. First, the threatened search would not have been in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Petitioner relies upon Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969) asserting that custody of Parson had been secured and he could not have reached the trunk of the car to secure a weapon or destroy evidence. *Chimel,* however, does not apply to searches conducted prior to a decision in that case. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). Under the prior law the threatened search would have been "incident to the arrest" because conducted in an area under "the control" of the person arrested. E. g., United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).[42]

■■■■ Moreover, even as interpreted in *Chimel,* the Constitution protects

---

41. As the court stated in *Miranda* at 478, 86 S.Ct. at 1630:

"Any statement given freely and voluntarily without any compelling influense is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefits of warnings and counsel, but whether he can be interrogated."

42. This case is distinguishable from Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Parson was in the car at the time of his arrest; Coolidge was in his house.

only against "unreasonable" searches and seizures. United States v. Davis, 461 F.2d 1026 (3rd Cir. 1972); United States v. Slocum, 464 F.2d 1180 (3rd Cir. 1972). "Exigent circumstances" may render a warrantless search reasonable. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Even if a search is not incidental to a lawful arrest, for example, law enforcement officers may lawfully search an automobile without a warrant if they have probable cause to believe it contains evidence or fruits of the crime and delay would jeopardize its seizure. E. g., Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); United States v. Davis, *supra;* United States v. Menke, 468 F.2d 20 (3rd Cir. 1972). Even the privacy of a dwelling may be invaded where life is at stake. Wayne v. United States, 115 U. S.App.D.C. 234, 318 F.2d 205 (1963) (dictum per Burger, J.). "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Warden v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967). In this case Kathleen Rae Maull was missing. The circumstances strongly indicated she had been seriously injured; they did not establish that she was dead. The officers were in "hot pursuit" of the aggressor and the victim. Parson's trunk was covered with blood. "Speed . . . was essential." Warden v. Hayden, *supra,* at 299, 87 S. Ct. at 1646. The officer moved to open it; "the exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). No unreasonable search was threatened.

 Secondly, the critical issue is whether Parson spoke of his own free will. Even if the threatened search would have been illegal, if consummated, this fact would be relevant here only if

it demonstrated that Parson's second statement had not been voluntary. Compare Wong Sun v. United States, 371 U. S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Hall v. Warden, 313 F.2d 483 (4th Cir. 1963). Petitioner's argument ignores the statement which he had already made and which was clearly not the product of a threatened search. This initial statement supports the trial court's conclusion that Parson talked about the crime because he wanted to do so.

## V. DID THE ADMISSION INTO EVIDENCE OF THE BLOOD SAMPLES, PUBIC HAIR COMBINGS AND FINGERNAIL SCRAPINGS VIOLATE DUE PROCESS?

The trial court ruled that the blood samples, pubic hair combings and fingernail scrapings were admissible (1) under the principles established in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) and (2) because they were taken with Parson's consent, freely and voluntarily given.

 *Schmerber* clearly establishes that this type of evidence is not testimonial and that the taking of such evidence by state officials does not violate an accused's right against self-incrimination. That case also establishes that a warrantless search of the person in a reasonable manner after a legal arrest does not violate the right to be free from unreasonable searches and seizures if the police (1) have probable cause to believe that the search will produce relevant evidence and (2) "might reasonably have believed that . . . [they were] confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" Schmerber v. California, *supra,* at 770, 86 S.Ct. at 1835. While this latter ruling sanctions the search which produced the pubic combings and the fingernail scrapings in this case,[43] it is at

---

43. The *Schmerber* court sustained the search as one incident to a lawful arrest.

The search had been conducted over an hour after the arrest at a place removed

least doubtful whether it sanctions the search which produced the blood sample.[44] I need not decide this question, however.

■■ The trial court's conclusion that Parson voluntarily consented to each of these three searches is fairly supported by the record. The officers testified that he voluntarily consented. He signed a permission form for the blood sample and took the scrapings of the pubic area himself. On the other hand there is no evidence to indicate that this consent was other than a product of his own free will. While Parson's counsel now places great emphasis on the length of his detention prior to 7:30 A.M., the significance of this must be evaluated in the context of a case where the defendant immediately and spontaneously admitted guilt and led the police to the body of his victim. All of the evidence is consistent with the finding that Parson wished to and did cooperate with the police in every possible way.[45]

\* \* \*

from the scene of the arrest. Here the searches which produced the combings and scrapings were further removed in time from the arrest. But the requirement that a search incidental to a lawful arrest must be "substantially contemporaneous with the arrest and . . . confined to the immediate vicinity of the arrest," Stoner v. California, 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964), must be applied in light of the reasoning behind the rule and the circumstances of the individual case. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ; United States v. Miles, 413 F.2d 34 (3rd Cir. 1969). Where (1) an in-custody search is of the person of the accused rather than the place, (2) the distance from the arrest in time and location is reasonably explainable on grounds relating to the health and safety of the accused, to other urgent demands of the investigation, or to legitimate arrest procedures, (3) there is probable cause and (4) delay may result in destruction of evidence, the courts, though differing in their analysis, have sustained the search despite the fact that it was not "on the spot." See e. g., Schmerber v. California, supra; United States v. Caruso, 358 F.2d 184 (2nd Cir. 1966) (station house search after six hours of detention) ; United States v. Frankenberry, 387 F.2d 337 (2nd Cir. 1967) (station house search one and one-half hours after arrest) ; Cotton v. United States, 371 F.2d 385 (9th Cir. 1967) (station house search after an unspecified period of detention) ; United States ex rel. Samuels v. Anderson, 304 F.Supp. 545 (D.Del.1969) (station house search three and one-half hours after arrest). Whether tested by the rule of these cases or the independent "exigent circumstances" doctrine, see Chambers v. Maroney, supra; Warden v. Hayden, supra, the warrantless searches which produced the combings and scrapings in this case were not unreasonable. The person of an accused remains within his control to a substantial extent even after his arrest. Evidence like these combings and scrapings may be destroyed or lost by the accused either intentionally or unintentionally. Parson was released from the hospital at approximately 2:00 A.M. The only safe alternative to these searches would have been to deny Parson even the opportunity to wash his hands pending preparation and presentation of a search warrant application the next morning.

44. The type of "emergency" presented in *Schmerber* did not exist here with respect to the blood sample. The circumstances were such that a police officer could reasonably have believed that defendant's blood type would have important evidential value. The blood sample was ultimately used for this purpose. There was no reason to believe, however, that an equally valid sample for this purpose could not have been obtained later after a search warrant had been secured. While Parson was told that the sample would be taken to test for alcoholic content, it is doubtful whether the record shows enough to sustain a finding that the officer had reasonable cause to believe that the results would be positive.

45. Even assuming, *arguendo*, that petitioner did not freely consent to the taking of the blood sample, the use of the fruits of that search at trial would not render his conviction void on the facts of this case. At trial the results of tests on the blood sample were used to establish the fact that Parson has type O blood. Other evidence showed that the murderer had type O blood and that approximately 45–55% of all persons have this blood type. It is the most common blood type.

If admission of this evidence was error it was harmless error beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## VI. DID DELAWARE'S UNITARY TRIAL PROCEDURE DEPRIVE DEFENDANT OF DUE PROCESS OF LAW?

Petitioner next asserts that Delaware's practice of trying the issues of guilt and of punishment to the same jury violates the due process guarantee of the Fourteenth Amendment. This was a situation, petitioner contends, where evidence helpful to his plea for mercy would at the same time be damaging to him on the issue of guilt. In this context Delaware's procedure forced him to the hard choice of either (1) electing to present evidence of his mental health and social history that might conduce the jury to a recommendation of mercy but which might, at the same time, work to his detriment on the issue of guilt or innocence or (2) electing to refrain from giving the jury evidence assertedly favorable to him on the question of mercy in order to avoid the possibility of prejudice on the question of guilt. This, petitioner argues, was "unconscionable."

Petitioner's argument is similar to, though considerably weaker than,[46] the argument rejected by the Supreme Court in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). It follows, *a fortiori,* from the reasoning in that case that Delaware's unitary trial procedure did not violate petitioner's right to due process of law. See also, Maxwell v. Bishop, 398 F.2d 138 (8th Cir. 1968), rev'd on other grounds, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); Pope v. United States, 372 F.2d 710 (8th Cir. 1966) rev'd on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968).

## VII. DOES PETITIONER'S SENTENCE VIOLATE THE EIGHTH AMENDMENT?

Petitioner Parson asserts that the imposition of the death penalty in his case is violative of the Eighth and Fourteenth Amendments. Reliance is placed upon the recent United States Supreme Court decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) which vacated death sentences imposed in three consolidated cases, holding "that the imposition in carrying out the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."

The nine opinions in *Furman* do not speak with a single voice to the question when, if ever, a state may lawfully take the life of a citizen. Nevertheless, a majority of the Court agreed that, at the least, capital punishment offends the Eighth Amendment when it is imposed "arbitrarily," 408 U.S. at 249, 92 S.Ct. 2726, "capriciously," *Id.* at 309, 92 S.Ct. 2726, or with "no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." Id. at 313, 92 S.Ct. at 2674. The majority further concluded, based upon our national experience with capital punishment, that the relevant question is not whether the record shows a history of arbitrary imposition of the death penalty in the particular state, but rather whether the law of the

---

The probative value of evidence that places the defendant in a class of persons which includes about one-half of the general population and of which the murderer is a member is not very great. After having considered on the basis of my "own reading of the record . . . what seems to . . . [me] to have been the probable impact . . . on the minds of an average jury" Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), I conclude that, in light of the overwhelming inde-pendent evidence of guilt, " '[the] minds of an average jury' would not have found the State's case significantly less persuasive had the testimony . . . been excluded." Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed. 2d 340 (1972).

46. The petitioner in *McGautha,* unlike the petitioner here, asserted that Ohio's unitary trial procedure imposed an unconscionable burden on his right not to testify on the issue of guilt.

state provides assurance against such arbitrary imposition. The familiar approach of leaving the jury broad discretion on the crucial question of life or death, a majority concluded, did not furnish the requisite assurance. As the Chief Justice said in dissent:

> "Today the Court has not ruled that capital punishment is per se violative of the Eighth Amendment; nor has it ruled that the punishment is barred for any particular class or classes of crime.
>
> \* \* \* \* \* \*
>
> The actual scope of the court's ruling, which I take to be embodied in these concurring opinions, is not entirely clear. This much, however, seems apparent, if the legislatures are to continue to authorize capital punishment for some crimes, juries and judges can no longer be permitted to make the sentencing determination in the same manner they have in the past." 408 U.S. 238, 396–397, 92 S.Ct. 2726, 2807, 33 L.Ed.2d 346 (1972)

While the *Furman* opinions leave a number of questions in the area open, they do clearly dictate a conclusion that petitioner's sentence is unconstitutional.[47]

Parson was convicted under 11 Del.C. § 571 (1970 Supp.) which provides:

> "Whoever commits the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping or treason, is guilty of murder in the first degree and of a felony, and shall suffer death."

Section 571 was applied in conjunction with 11 Del.C. § 3901 (1970 Supp.) which reads:

> "In all cases where the penalty for crimes ascribed by the laws of this State is death, if the jury, at the time

of rendering their verdict, recommends the defendant to the mercy of the Court, the Court may, if it seems proper to do so, impose the sentence of life imprisonment instead of death."

In this case, after reciting Section 3901 to the jury, the trial judge, as was the customary practice, charged in part:

> "This statute is plain upon its face and means what it says. It does not mean that the jury shall in every case make such recommendation but only when the evidence, in the judgment of the jury, warrants it. It does not mean that the jury shall make such recommendation from sympathy alone. The statute, however, is a humane provision of the law. In this case if your verdict should be guilty of murder in the first degree, you were to be warranted in making the recommendation if you believe from the evidence, all things considered, that life imprisonment would meet the onus of justice and be sufficient punishment for the crime."

The undefined discretion which Delaware's statutory scheme granted to the jury in this first degree murder case was inconsistent with the Eighth Amendment to the United States Constitution as construed in *Furman*. Assuming, without deciding, that a jury charge with objectively determinable criterion might cure this deficiency, the jury charge in this case did not. Accordingly, the sentence of death cannot stand.

\* \* \*

## VIII. WERE THERE OTHER ERRORS OF CONSTITUTIONAL DIMENSIONS?

■ I have considered each of petitioner's other claims and find them to be without constitutional substance.[48]

---

47. At the time of the *Furman* decision, the Court remanded two Delaware cases which presented issues similar to those present here. In Steigler v. Delaware, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972) and Seeney v. Delaware, 408 U.S. 939, 92 S.Ct. 2871, 33 L.Ed.2d 760

(1972) the Court vacated state court judgments "insofar as [they leave] undisturbed the death penalty imposed". 408 U.S. 933, 92 S.Ct. 2870, 33 L.Ed.2d 745 (1972).

48. In order to provide the relevant record references, I comment briefly on peti-

## IX. CONCLUSION

After a thorough review of the voluminous record in this case, I am convinced that petitioner's trial was conducted in a manner consistent with the Constitution of the United States. His conviction, accordingly, is valid. Moore v. Illinois, *supra,* 408 U.S. at 800, 92 S. Ct. 2562, *cf.* Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); United States ex rel. Davis v. Henderson, 330 F.Supp. 797 (W.D.La. 1971); Ward v. Henderson, 317 F.Supp. 344 (W.D.La.1970). Petitioner's sentence, on the other hand, cannot constitutionally be carried out and he is entitled to appropriate relief from this Court.

■ Section 2243 of Title 28 of the United States Code provides that upon petition for a writ of habeas corpus, "the court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." It has long been held that a federal court, upon finding that a petitioner's custody is unlawful, may in the interest of justice delay discharge of the petitioner for such reasonable time as may be necessary to allow the state to correct the defects which renders the discharge necessary. Mahler v. Eby, 264 U.S. 32, 44 S. Ct. 283, 68 L.Ed. 549 (1924); In re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890). Where, as here, the constitutional defect goes to the sentence and not the conviction, the Supreme Court has said, "there does not seem to be any good reason why jurisdiction of

the prisoner should not be reassumed by the court that imposed the sentence, in order that its defect may be corrected." In re Bonner, 151 U.S. 242, 259, 14 S.Ct. 323, 326, 38 L.Ed. 149 (1894).

■ The Superior Court of the State of Delaware has ruled in a somewhat different context that where a death sentence cannot legally be entered upon a valid conviction of first degree murder, the trial court may impose a sentence of life imprisonment. State v. Johnson, 295 A.2d 741 (Del.Super. 1972). This holding may indicate that the Superior Court could remedy the constitutional infirmity in this case by resentencing petitioner to life imprisonment under Rule 35 of the Rules of Criminal Procedure of that court. Such action would not, in this Court's judgment, provide petitioner with less than the relief to which he is entitled under the United States Constitution. *Cf.* United States ex rel. Davis v. Henderson, 330 F.Supp. 797 (W.D.La.1971); Ward v. Henderson, 317 F.Supp. 344 (W.D.La.1970); People v. Anderson, 100 Cal.Rptr. 152, 493 P.2d 880 (Cal. 1972); Huggins v. Commonwealth, 191 S.E.2d 734 (Va.1972); State v. Johnson, *supra.* I express no view, however, on whether this is a permissible or appropriate procedure under Delaware law. The Supreme Court of Delaware has noted this question but has not yet spoken on the point. State v. Dickerson, 298 A.2d 761 (Del.Supr.1972) (question reserved). It is sufficient for present purposes to hold that petitioner must

---

tioner's claim that he was denied due process by an alleged failure of the state to introduce evidence which it alluded to in its opening statement. The prosecutor stated that, "In the house was found certain parts of the clothing of Kathleen Maull, her pants and other parts of the clothing. . . . On the back porch was found her watch. Near the highway was found her blouse." (Tr. 1756). At trial testimonial evidence was introduced that a pair of blue jeans was found in the house; these admittedly belonged to the victim and were introduced into evi-

dence (State's Exh. 19). A garter belt, underpants, and stockings were received in evidence. (Exhs. 21 and 22). A brassiere found outside the house was identified and admitted into evidence (Exh. 27) and a blouse found at the edge of the road upon which the house sat was introduced (Exh. 28). While the watch spoken of in the opening statement was not introduced, testimonial evidence was introduced that a ladies wristwatch was found on the back porch of the house. (Tr. 1998). There was no prejudice.

be discharged unless the state commences and prosecutes proceedings which will relieve petitioner of all consequences of the sentence of death and result in constitutionally permissible custody.